Your Honour, Priya Swaminathan for Appellants. And I'd like to leave three minutes for rebuttal. Okay. So, we're here to argue a challenge to certain DHS policies, and there are basically two policies that are the subject of this appeal. The first is Section 4350, which is a broad Internet and electronics ban. Basically, it bans anything which has any kind of wireless capacity or could at any future time have a wireless capacity, which basically covers most and all electronics. So, appellants are challenging that on 14th Amendment and First Amendment grounds. That's the first issue. Regarding the 14th Amendment challenge, appellants are arguing that the government has not shown legitimate security concerns  because they were either given the option of having unfettered Internet access or no Internet access. There's been absolutely no tailoring to see if they could still have some electronics, but with a more limited Internet access to them. And the ban is so broad that it takes into account any and all kinds of electronics, for instance, a radio. Appellants have not cited a single security concern that a radio with wireless connection could possibly cause any kind of security concern. How is a radio that can possibly connect to the wireless a security threat? But under this ban, such a radio would also be covered. Similarly, they have not provided enough evidence of how many people actually violated any DSH policies. They cite 60 incidents in four years, but we don't know if this was one person who violated the policy and caused 60 incidents out of a population of 1,000 people. We don't even know if it was a SVP patient, because DSH houses both SVPs and inmates. So — Well, now, under — excuse me, counsel. Under Block v. Rutherford, usually we have to defer to institutions. What evidence, really? You're suggesting we know that only six or seven people were using this, but I couldn't find substantial evidence in the record that DSH exaggerated its descriptions of the problems with Regulations 40 through 50. What, really, is there in the evidence, other than the fact that we know only that only a few people were doing it? Your Honor, the problem with that is, I mean, where do we set the standard in terms of what an exaggerated response is? Since this ban — I mean, the Supreme Court in Packingham v. North Carolina has clearly said that the Internet now is no longer just a convenience. There is no substitute to the Internet as a public forum where individuals can interact and discuss things with each other. Therefore, when you're actually restricting a civil detainee from any and all access and any and all electronics, regardless of whether it has an Internet capacity today or not, that it could have sometime in the future, there has to be some showing that the security concern — if what Your Honor is saying is true, is if one person accesses the Internet in a manner that's not appropriate, then this makes the security concern that this is not an exaggerated response. Well, the evidence from the declarations from Maynard and Duvall suggests that they'd opened 20 criminal investigations, that they'd had numerous problems of downloading child pornography. It's a high volume of policy violations, 60 reported incidents. And he describes — without describing names, describes generally things that happen. Now, in where we're dealing in a civil facility, but where we're dealing with SVPs, why isn't that a reasonable response? Because if you look closely at Mr. Duvall's testimony, once again, he does say — he has a substantial amount of allegations against patients accessing the Internet. Some of them are speculative. Some of them are things they could do in the future. If you actually parse out the language he's using, he has two parts to his testimony. So there's one part of all the evils he's citing are potential evils that could happen if the inmates got unfettered Internet access. And here my clients are not arguing for unfettered Internet access. The first part of it, where he does talk about having found certain violations, narcotics or even child pornography, once again, the data is impossibly vague because he says, I saw 200 images of child pornography. At that point, not even 60 or 70 inmates had computers. So are we talking about one person who had 200 images of child pornography on his computer? And some of that problem could be taken away, as the amended regulation has done, by taking away data storage capacity. We don't even know if these images were downloaded from the Internet.  The problem for me is that he found these images on a computer, a number of computers. I think part of what is difficult here is what constitutes an exaggerated response. This is why the numbers are important. I'm not asking the court to set a bright-line number or a bright-line rule, but I'm saying there are two problems with exaggerated response, which is that it covers even things where none of these security concerns would be implicated. Like I said, like a radio or a gaming device. Let me come back to the radio. As I understand the regulations, they forbid electronic devices that are capable of Internet connectivity. The radio, as you described it, is not so capable. Am I misunderstanding your argument? No, nowadays you have radios that connect to the Internet. So if I just have an old-fashioned transistor radio, is that barred? If you had an old-fashioned, it would not be barred. Unless the government makes the argument that nowadays, one of the arguments they're making is if you send the radio out for repair and it comes back Internet-enabled, because nowadays it's rare to find an electronic which cannot be modified to have some kind of wireless connectivity. But an old-fashioned radio that is simply a receiver is okay? Yes. Okay, got it. So there are two problems with exaggeration. So I'm not just focusing on numbers. I'm also focusing on, like I said, the sheer breadth of it, which is exaggerated. And the DSH admits this because the initial regulation was passed in 2009. Just before this briefing started, it was amended with certain modifications because DSH admitted that that was too broad. Now, recently, on October 8th, the government filed a letter, a 28-J letter, saying that this has been amended again. And on page 9 of that letter, they admit that the amended regulation was broader than they actually anticipated and did bar some electronic devices which they had not intended to bar, and so they're re-amending it. So maybe the government is acknowledging that it is too broad. It's covering way too many electronics. It has absolutely no fetters to it. But it's taken nine years to go from the original amendment to the October 8th amendment, and these amendments are very minuscule. They're a sentence here, a sentence there, which still leave the underlying problem unchanged, which is that the statute is just far too broad. And the second problem with the exaggeration is the only evidence they have in the record that they can't provide them some Internet access is because they said they'd have to monitor every single device in order for them to be able to give them. Given today's technology, that's simply not true. My two-year-old child has a baby Kindle. Amazon gives you these Kindles for kids, and all you do is you put parental controls, and he's limited to four websites, his blippy videos or his cartoons, things like that. It's that simple nowadays to be able to give them some access and say, look, but we've controlled it. I don't have to go in every day and look at his watch history. That's what technology provides today. So in that sense, too, it's exaggerated. It's simply not commonsensically, it does not make sense to say the only way to provide you any access is if I, you know, have to check every single computer. I understand there are numerous problems. There is the digital storage problem. That can be done. Is the government obligated by the First Amendment to provide Internet access? So the second issue would be Robinson filed a motion for leave to amend on First Amendment grounds about a year after the court's scheduling order on this, and it was denied because of undue prejudice. The court did not give any specifics on what the undue prejudice was. So it was filed a year after what, after the district court issued its? The scheduling order was issued in December 2014. Appellant Robinson moved to amend December 2015, a mere year later, and he was denied leave on the grounds of undue prejudice. Now, the district court absolutely failed to give any specifics on what this undue prejudice was, and if you look at the history of claims on this particular claim, the litigation, active litigation, had been going on only for a year and a half. Well, and I think the reason the district judge gave in addition to what you just mentioned is that the district judge thought that on remand it wasn't open to allow the amendment. Sorry, I'm sorry, can you? As I understand it, the district judge refused to allow the amendment to add the First Amendment claim on the ground that there had been a remand from the Ninth Circuit and did not leave open that possibility. Right. I think that's an incorrect reading of what the Ninth Circuit had previously done. If I read what the Ninth Circuit, because at the time that the motion to dismiss was appealed to the Ninth, initially the computer claims were all dismissed in 2012, and they were appealed to the Ninth Circuit. At that time, there was no First Amendment claim for the Ninth Circuit to actually rule on. So the Ninth Circuit could not have looked at the merits of a First Amendment claim. What the Ninth Circuit said was, George Allen argued in his appellate brief that his First Amendment rights had been violated, and what the Ninth Circuit said was, we will not look at this issue for the first time now. It's not even there in the pleadings. This was years before Robinson actually made his First Amendment claim.  That's simply not true. That's a wrong reading of the Ninth Circuit opinion. Right. So it may be useful to send it back to the district court and say, you were not precluded by the Ninth Circuit's earlier rule. Exactly. Because if you look at the procedural posture of these claims, these claims are stayed from 2010 to 2012 because there was mediation. From 2012 to 2014, they were dismissed until the Ninth Circuit reinstated them June of 2014. So active litigation on these claims only started after June 2014. So he's amended within a year and a half of that. In fact, an answer in this case was in files of September 2014, and he's a pro se prisoner. So there's no undue delay. The government has had two chances to respond, and they've not cited any prejudice that they need additional discovery. In fact, they briefed why it's futile, everything without any discovery. So where is the prejudice? Where is the futility? The futility argument was never briefed. Okay. You're down to about three minutes, which you sought to preserve. Let's hear from the other side. The only other small point I want to make is there's an Eighth Amendment claim. They just want personal undergarments because they feel like there's a human dignity. Say it in front of the microphone or you won't be recorded. Say it one more time in the microphone. I'm sorry. The only other point I'd like to make is there's also an Eighth Amendment claim for personal undergarments. The prisoners want to be able to own their own personal undergarments, which right now DSH policy doesn't allow. Yeah. What evidence? I know that they allege that this was, that this policy was enforced differently in State prisons and outside of California in Washington State facilities. And what evidence did you put into the record on that? Oh, well, so I put in evidence. So what was argued below was mainly that they're getting clean underclothing, even if it's being rotated and they're getting different prisoners' clothing. And what I argued was, but it's not just about clean clothing. It's about the human dignity aspect of the Eighth Amendment. What they're saying is we simply don't want to wear someone else's undergarments. And I'm saying there is no evidence that any prison anywhere actually forces prisoners to wear other people's undergarments. Well, that's what they allege, but I never saw any of the evidence. Well, I did a supplemental record and asked you to take judicial notice of the CDC manual, which allows prisoners in California the option of either getting underwear from the common pool or purchasing their own underwear. So even the CDC. Well, okay. So they don't give them the option here, but apparently it's not inconsistent with policies in other facilities in California. So I understood that you were making a comparative argument when you started. I never saw the evidence of the comparison. I'm sorry. What comparison? The comparison that at this facility you were treating these inmates differently from the way they were being treated elsewhere, either in California or outside of California, including Washington State. The difference is not having that option, because there are inmates who simply find that repulsive. It doesn't matter if it's laundered or not. And there's no social setting really where you have that option, where you're forced to wear someone else's undergarments. For them, it's like saying I'm going to give you clean diapers, but you're not going to be happy wearing diapers for an adult person. They might be clean, but that's a human dignity act. I mean, we went through decades in this country where cloth diapers were laundered outside and then returned. Precisely. And then we moved on, where we don't do that anymore. Okay. Thank you. Good morning. May I? Good morning, Your Honor. My name is Lisa Tillman. I represent the appellees, Audrey King and David Landrum, in this appeal brought by three sexually violent predators housed at Coalinga State Hospital. We respectfully request this Court affirm the district court's entry of summary    The second case is a case in which a woman is accused of having sex with a man under substantive due process claims, the challenge to the regulation banning the personal possession of Internet-capable computers and other electronic devices, as well as Coalinga State Hospital's policy of laundering commonly assigned clothing, including underwear, provided to these plaintiffs. Now, let me get to that last one first, just because it's fresh in our mind, given the order of the argument we just had. It's obvious that it is unnecessary for penological purposes or for institutional purposes that it's not necessary to require that the people held at Coalinga use commonly shared underwear, because obviously the California State prison system doesn't do that. They give the prisoners the option of having their own. So what possible justification does Coalinga have for its policy? First, let's back up a little bit, if we could, Your Honor. In examining the record in this case, yes, one of the complaints did say in its 50-odd pages that there was a concern in regards to commonly assigned underwear. However, when it came time for the motion for summary judgment, by that time, the Idaho Law Clinic, working with these plaintiffs, had narrowed down many of the issues. And at the time of the motion for summary judgment brought by the defendants, the issue of any sort of cognizable constitutional claim to personally assigned underwear was simply not before the district court. The only issue briefed before the district court was the issue of whether or not the clothing of these sexually violent predators was indeed properly laundered by the Department of State Hospitals at Coalinga through the prison industry authority. They were contending that the laundry was not effective, and they were concerned about whether or not their clothing, especially their underwear, was appropriately laundered and cleaned. There was nothing before the district court in regards to a claim regarding some sort of Eighth Amendment right to personally assigned underwear. And in fact, the Eighth Amendment does not cover that issue. It's a Fourteenth Amendment issue when it comes to sexually violent predators housed within the Department of State Hospitals. And second, the Department of Corrections is definitely not analogous to the Department of State Hospitals. They're operating under Title 15 of the California Code of Regulations, and they also provide commonly assigned underwear, T-shirts, as well as other clothing to inmates. That's in their property matrix. And so to say that state prisoners get something that state hospital patients don't would be not accurate in terms of the record. Wait a minute. I was up to you until the very end. What do you mean it's not accurate in terms of the record? It sounds as though it is accurate that the state prisoners have a choice and the coaling inmates do not. Coaling patients do not have a choice. They are given commonly assigned underwear, but so are state prisoners. Are they required to accept the commonly used underwear, the state prisoners? I really can't speak to that, Your Honor. That, again, was not briefed before the district court. It may not be properly before us, but it sounds as though there's sufficient information from what we have that we can determine what goes on in the state prisons. But if it's not before us, it's not before us. I would agree with that, Your Honor. Is there a reason that the state wants to tell us as to why they use commonly assigned underwear as opposed to personal underwear? Again, Your Honor, I would hesitate because, again, it's not before this court. It wasn't before the district court. However, when you combine internet capability and the ability to contact outside vendors to purchase personal underwear and you bring that personal underwear into an institution where you've got over 900 sexually violent predators and they all want their own underwear laundered in a certain way, you could have potentially 900 sexually violent predators handwashing their undergarments in their shower facilities, as was the testimony of some of these plaintiffs, rather than using appropriate laundry facilities that meet the requirements, the stringent standards of a hospital institution like the Department of State Hospitals at Coalinga where you have Title 22 saying you've got to use a certain type of detergent with a certain pH balance and trouble dry it for a certain amount of time. Do we know how prisoners in the California state prison system launder their own underwear? With their hands. Okay, so they launder it by hand. As far as I know, Your Honor. And it seems to work okay even though they probably aren't using the right pH and they may not get water that's as hot as the industrial laundries. Your Honor, at this point in time, given what we see, even in terms of the article from NIOA in terms of occupational safety and health, the issue of the MRSA infection being spread is, of course, very pertinent when it comes to laundering of any personal undergarments. And so I would hope that this Court would abide by that sort of national standard as well as state standards in terms of requiring commonly used clothing and other articles of linen and bedding to be properly used. You just took a left turn because you're now arguing that's what you have to do if it's shared. But the question is, does it have to be shared? If you don't share it, how do you launder it for your own purposes? And even if it's being laundered for your own purposes, Your Honor, because people are in close contact, you want to be sure that their clothing is well attended to and meets certain hygiene standards. But I'm using up my time on an issue that's not before this Court. I get it. So, yeah, let's move on to what may be properly before us. In regards to the computer claims, Your Honor, what we have in front of us today is a challenge to a regulation that came into effect in 2009. These plaintiffs essentially contend that they should be entitled to Internet-capable devices. However, what we see in the record is no substantive due process violation, if even a cognizable right. What we see is uncontroverted evidence that was presented to the District Court establishing that when these patients, over 900 sexually violent predators at Coalinga State Hospital, the sheer majority of patients at that hospital, are given computers, even without Internet capability, they find a way to make them Internet-capable. We've seen the published decisions of N. Ray Robinson and People v. Golden that those Internet-capable modifications created situations where child pornography was imported into the institution and could be distributed to other patients. We also see from the declarations that were provided by the defendants in this case that the Internet capability allowed for contact with not only prior victims but potential victims in the community, as well as accessing social media sites to obtain profiles of potential child victims, as well as on staff working at the hospital. There was copyright violations in terms of burning disks, as well as issues of obtaining geographical information to plan escapes and contact people who would help them with those escapes. So there's a complaint. Kagan. Excuse me, counsel. The statement made by opposing counsel was overbroad. This was on summary judgment. And evidence was there that there were given some prisoners or some patients were given access to machines but were broken and didn't work. And why isn't there a triable issue of fact on these issues? In regards to access to computers that work, Your Honor? Whether the prohibition was overbroad because, yes, we give access to the Internet in our own way with our own computers. The evidence appeared to be that a lot of those were just broken down and didn't work. Why wasn't there a triable issue of fact as to the breadth of the regulation? There is no triable issue of fact in regards to the breadth of the regulation, Your Honor, because, in actuality, the issue that was being pursued by the plaintiffs was simply personal possession of Internet-capable computers. They were not making any claim that the supervised access they had to computers in the computer lab was in any way ineffective. What they only wanted out of this litigation was their own computer with Internet-capable access. And, as a result, the issue is truly, does Section 4350 provide for an effective means for hospital administrators to prevent the criminal activity of these sexually violent predators, people who have been deemed likely to engage in further sexually violent acts? And we submit, Your Honor, given this population of over 900 sexually violent predators out of a population of 1,100, given the over 60 to 70 cases involving child pornography, as well as 2 to 3 cases of child pornography reported each month to the Department of Police, that this regulation was appropriate and not excessive. It was the only way to address a situation where sexually violent predators, unlike 2-year-olds, were engaging in very proactive actions to obtain Internet access. This is not a situation where any firewall issue or any parental controls were discussed before the trial court, but I would submit, Your Honor, that those would not have worked in this instance because of their activities. Let me pursue the same line of questioning that Judge Nelson just initiated. It may well be that we would agree with you or agree with you to the extent that we would defer to the judgment of the hospital administrators as to the dangers of giving to the individual patients their own computers. But if there is some interest in the inmates having access to Internet information, it would seem to me at least part of the argument that you ought to consider other mechanisms by which the inmates would have access to the Internet that would not pose the same dangers, which is to say, for example, in the library there would be computers that would be controlled by the hospital so they know that they're not capable of being misused. But you say, well, it doesn't matter if you do that. I'm not sure that that's right, that that doesn't matter. If I might address that, Your Honor, what we do see, and I'm asking the Court now to look at the emergency amendments to Section 4350 that are pending before the Office of Administrative Law, but which have been put into effect pending that approval, under subsection C we have language. Okay, I've got it right here in front of me, so what page am I supposed to look at? That is in our request for judicial notice, Your Honor, at page 50, I'm sorry, page 60. And what we see in subsection C is that there is allowed Internet access where there is essentially supervision of the patient in a common room where there are computers available for supervised use. And so it's not that all Internet access is disabled. It's that personal possession of computers with Internet access is prohibited. But there is available to patients on a temporary basis for use in an observable common room, a computer lab, the ability to use devices with Internet access on a case-by-case basis. And that accompanies your October 8th letter that you just sent to the Court. Is that the judicial notice? No, Your Honor. This is a request for judicial notice that was filed in April 24 with our answering brief. I'm sorry. That I have downstairs. Okay. But judicial notice of a regulation is something quite different from fact-finding as to whether or not these exist in accordance with what the regulation seems to contemplate and so on. Do we need to send it back? If we think it important that there be some access to the Internet that is supervised and safe, do we need to send it back to see if, in fact, the regulation is providing what the regulation promises? Keeping in mind that this litigation began in 2006, and between 2006 and today's day what we see is not only the promulgation of Section 4350 in 2009, but also now these amendments, we would ask that the Court affirm the district court's summary judgment on the Section 4350 as it existed at the time of summary judgment. Should the plaintiffs or other patients within the hospital have concerns regarding how these amendments to Section 4350 and their ability to get Internet access under these amendments have any issues about that, then they can bring a new complaint. Well, but if we affirm what the district judge did, that automatically means that what the institution has now offered is permissible because what the district judge was looking at was a record that was less favorable to the patients than what you now have. So you can say, yeah, they can bring it again, but I think it necessarily follows that we affirm what the district judge did with the record before the district judge, that what now exists because it's better for the patients, I mean, game's over, they lose. What am I missing? They chose to file under this particular Section 4350. So they chose not to bring up before the district court any issues regarding Internet access through the computer lab room or through other areas provided by the hospital. And so I believe the record is set in regards to that, Your Honor. What's your view as to the First Amendment claim that was not permitted to be added? In regards to that matter, Your Honor, I know I'm going into my time here. I think the Court is correct that the Ninth Circuit indicated that that was simply not timely presented in the course of the initial appeal of the motion to dismiss. However, when it was sent back down. Well, it wasn't presented at all. That's correct. The Ninth Circuit said it was not timely presented on appeal. But what we do see is a futility issue. What we see in the Court's record is that this request to file a fourth amended complaint was made after the answer was filed in 2014 and after the motion for summary judgments were filed in 2015. Given this case was started in 2006 and discovery had been going off and on with the help of the Idaho Law Clinic for many years, I think the Court was completely within its discretion in saying that basically we don't want to hear a new claim at this time. We're going to proceed on the claims that have already been addressed in the motions for summary judgment and in the answers. And let's move on from there. I have to say what bothers me at root about this case is that these are not convicted prisoners. And as you quite rightly pointed out, this is not an Eighth Amendment case. It's a Fourteenth Amendment case. Because these are civilly committed people. These are not prisoners. These are not there because they're convicts. They are not there and cannot be punished. Which means that the deference we give in prison cases comes up in such a different context that I'm a little reluctant just to bring over all the deference we give to the prison operators because they can punish. The defendants here cannot punish. We understand that, Your Honor. But even in the context of providing more considerate treatment to civil detainees in a secure facility created for their detention pending any release into the community, during that time there are reasonable restrictions that may be made in order to ensure the safety of the public and staff. And what we're saying here, the Internet capability of computers creates a safety issue. This organization tried in multiple ways, as seen in the declaration of Jamie Mangrum, to address through constant surveillance, through ongoing checks of the computers, epoxy and Ethernet ports. And quite frankly, those means were defeated time and again, despite exorbitant resource expenditure by the hospital. And on that basis, the district court recognized that this was a situation that really did require a complete prohibition on Internet capability. Okay. Thank you very much. Thank you. Your Honor, I'll be brief. Just a couple of things. Where the laundry claim is concerned, Appellant George Allen and Appellant Wayne DeBerry did argue the human dignity asking the complaint as the government conceded. The way the district court chose to frame it and the way the government chose to present the argument as a laundry issue doesn't take away from the fact that Appellant Allen and DeBerry said, we don't want this because we don't feel clean, not just in terms of the laundry aspect of it, that this actually violates our Eighth Amendment rights. And as to the legal point, the Eighth Amendment is applied through the Fourteenth Amendment where detainees are concerned. So standards that apply to the Eighth Amendment can be used to look at a substantive Fourteenth Amendment claim, even with the laundry's concern because there's plenty of case law that says the Eighth Amendment is applied through the substantive due process clause of the Fourteenth Amendment in detainee cases. That was my response to the laundry claim. Okay. Just a couple of points you made about why this is a security risk shows the problems with the evidence if you parse out because they've given you a lot of security concerns, but if you start parsing them out, for instance, she talked about an aerial shot of DSH. The first thing I did when I got the case was I typed in DSH. This aerial shot comes up. It's kind of a blurry, fuzzy picture, which the DSH puts on its website. So the entire world has access to this. They could get in the mail, you know, if they're actually plotting some kind of security threat, anyone outside has access to this picture. Same way with the Facebook posts. They're saying it could be used for extortion. These are posts voluntarily put out there to the public. They could get this information through the phone, through the mail. Someone could write to them. How do you use it? I got it. Now, I notice on my sheet here that you're a pro bono appointment. Are you appointed by this circuit for purposes of this argument? No, for the briefing and this argument. For briefing and argument, but you're appointed pursuant to our pro bono program? Yes. I'd like to say this on behalf of the court, both to you and to the others who participated in this program, it's very useful. We very much appreciate the effort you put in. My thanking you on behalf of the court is in no way, of course, a prediction of how we would rule on the merits, but it's a thank you for doing that. As to Ms. Tillman, thank you also, even though you're being paid. Okay. I would just like to thank the court. It's my first Ninth Circuit argument, and though I was nervous in the beginning, you made it very comfortable for me. Okay. Thank both sides. Alan et al. versus King et al. Submit it for decision.
judges: D.W. Nelson, W. Fletcher, Bybee